**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Criminal No. 1:19-cr-307-RCL** |
| | **:** | |
| **BRITTANY JONES,** | **:** | **Government's Sentencing Memorandum** |
| | **:** | |
| **Defendant** | **:** | |
| | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, Matthew Graves, United States Attorney for the District of Columbia, Janani Iyengar, Assistant United States Attorney, and Elizabeth Hutson, Trial Attorney for the Department of Justice, hereby files this Sentencing Memorandum in the above-captioned case. Sentencing is scheduled for December 9, 2022, at 12:30 p.m. As to Brittany Jones ("the defendant" or "Jones"), The United States asks this Court to impose a term of imprisonment of 180 months, to be followed by 10 years of supervised release.

I.    **RELEVANT BACKGROUND AND INTRODUCTION**

On October 17, 2019, a grand jury in the District of Columbia returned a 15-count Superseding Indictment in Case No. 1:19-cr-307 charging Willis Pierre Lewis, Brittany Jones, Dyamond Smith, and Ronda Manns with: Counts 1 and 2) Sex Trafficking by Force, Fraud and Coercion, in violation of 18 USC §§ 1591(a)(1), (a)(2) and (b)(1); Counts 3 and 4) Sex Trafficking of Minors, in violation of 18 USC §§ 1591(a)(1), (a)(2), and (b)(2); Count 5) Conspiracy to Sex Traffic Minors, in violation of 18 USC § 1594(c); Counts 6 and 7) Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of 18 USC § 2423(a); Count 8) Conspiracy to Transport Minors with Intent to Engage in Criminal Sexual Activity, in violation of 18 USC § 2423(e); Counts 9 and 10) Transportation, in violation of 18 USC § 2421(a); Count 11)

Interstate Travel and Transportation in Aid of Racketeering, in violation of 18 USC § 1952(a)(3)(A); Count 12 Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 USC § 922(g)(1); Counts 13 and 14) Obstruction of Enforcement of Title 18 USC Section 1591, in violation of 18 USC § 1591(d); and, Count 15) Assault, in violation of 22 DCC § 404(a)(1). Willis Pierre Lewis was named in Counts 1 through 13 and Count 15 of the Superseding Indictment. Brittany Jones was named in Counts 3 through 11 of the Superseding Indictment. Dyamond Smith was named in Count 5 of the Superseding Indictment. Ronda Manns was named in Counts 5, 11, and 14 of the Superseding Indictment.

Jones pled not guilty to the charges against her and elected to proceed via a jury trial, which began on May 5, 2022. Defendant Willis Lewis also pled not guilty and was tried alongside Ms. Jones.

On May 23, 2022, the jury returned a verdict of guilty as to Counts 3, 4, 5, and 11 of the Superseding Indictment with respect to Jones. *See* ECF No. 330. Jones was acquitted on Counts 6, 7, 8, 9 and 10. *See* ECF No. 330. Lewis was convicted on Counts 1 through 12 of the Superseding Indictment. *See* ECF No. 330. Lewis was acquitted on Count 13.[1] *See* ECF No. 330.

II.    **THE OFFENSE**

On May 14, 2019, the Federal Bureau of Investigation Child Exploitation and Human Trafficking Task Force ("CEHTTF") was advised that several minor females, who had previously been identified by law enforcement as missing and endangered juveniles, were believed to be featured in online advertisements, offering the minor victims up for commercial sex work.  Law

---

[1] The Court granted Mr. Lewis's Motion to Sever as to Count 15. *See* ECF Nos. 59, 115, 120.

enforcement located advertisements for Z.S., a fifteen-year-old female, and T.H.Y., a seventeen-year-old female, on megapersonals.com and listcrawler.com, two websites known to be frequently used for the posting of commercial sex advertisements. Multiple advertisements containing photographs of Z.S. and T.H.Y. were listed on these websites between April 24, 2019 and May 12, 2019, in the D.C. Metropolitan area, advertising the minors to engage in commercial sex acts. As examples, law enforcement located the following advertisements (quoted text is as found in the original):

a. An advertisement posted on megapersonals.com on April 25, 2019 titled *"Young Sexy and READY"* which contained the text *"Petite Body BIG TITTIES And Nice Booty SS - 60 HH - 120 H - 240 In need of transportation to you for outcalls FaceTime and Phone Call Available For Proof Of Me"*[2] and contained two image files depicting T.H.Y. posed suggestively, including one of her bare breasts. The contact number was listed as 202-823-7009, and the location was Washington, D.C.

b. An advertisement posted on megapersonals.com on April 26, 2019 titled *"Young HOT AND SEXY"* which contained the text, *"Hello I am looking for generous men interested in Some Grown & Sexy Adult Fun OUTCALLS serious People ONLY ♀♀♀ must Send pic wanna see me ? go head , you know you wanna call (347) 931-9661"* The advertisement contained two image files depicting T.H.Y. and three image files depicting Z.S., both posed suggestively in each image. The contact number listed was 347-931-9661, and the location was listed as Washington, D.C.

c. An advertisement posted on megapersonals.com on April 30, 2019 titled *"2 Lovely Ladies [Incall Only] Waiting To Excite Your Day (SERIOUS INQUIRIES ONLY!)"* which contained the text *"Light skin-(thick juicy titties and pussy is always wet and ready 🔞) Brown Skin-(round fat ass,big bouncy titties,shaved pussy)"* and two image files each of Z.S. and T.H.Y. posed suggestively in underwear and lingerie. The contact number on the advertisement was listed as 443-403-7266 and the location was listed as Washington, D.C.

d. An advertisement posted on megapersonals.com on May 1, 2019 titled *"Special Late Night EscapadesCome Take A Dive Make You Feel Alive"* which contained

---

[2] In law enforcement members' training and experience in investigations of this nature, an "outcall" is a commercial sex date in which the commercial sex worker goes to the client's location to engage in the commercial sex date, and an "incall" is a commercial sex date in which the client goes to the commercial sex worker's location to engage in the commercial sex date. References to SS, HH, and H mean rates for "short stay," which generally refers to a 15-minute period of time or shorter, a half hour, and an hour, respectively.

the text *"Amazing Light Carmel, Slim Waist, Round Juicy Titties, Super Phat Wet Pussy"* and contained five image files and three video files depicting Z.S. posed suggestively, including one in which depicts her nude body. The contact number on the advertisement was listed as 262-299-6960, and the location was listed as Washington, D.C.

e. An advertisement posted on megapersonals.com on May 9, 2019 titled *"Available & Ready To PlaySweetest Sensations, Come Get Your Mind Right"* which contained the text *"⏩I'm 21Yrs Young & Very Sexy ♥ ⏩My Body Will Amaze You And My Skills Are Out Of This World ♥ ⏩My Touch Will Soothe Your Every Need ♥ ⏩Ready For Your Company NIGHT ♥ OPEN MINDED & LOVE TO PLAY★SKIN SO SOFT YOU WILL KEEP COMING FOR MORE! ●Independent⫻ ●Very Discreet⫻ ●Respectful⫻ ●NO RUSH!!⫻ ●Very Friendly My services charge as below: Ss→80 Hhr→120 Hr→200 6 Hrs→850 I Love What I Do & I Want To Have A Nice Time With You CALL OR TEXT NOW 2408170418."* The advertisement contained five image files and two video files of Z.S. posed suggestively in underwear, and at least one image depicted her naked breasts. The contact number on the advertisement was listed as 240-817-0418, and the location was listed as Washington, D.C.

Law enforcement later learned that Z.S. and T.H.Y. ran away from a residential treatment facility located in Virginia on or about April 21, 2019. *See* ECF 328 No. 27. After running away, the minors met a taxi driver who eventually took them to a hotel in D.C. A few days later, on or about April 24, 2019, Z.S. and T.H.Y. met Fowler on a street in D.C. Fowler told them he could help them "make money" and introduced them to Brittany Jones[3] because he believed she could help with transportation to and from commercial sex dates. *See* Fowler Tr. Testimony 55:7-17. Fowler told Jones that he "had" two individuals "trying to make money on one of her parties" and told her she would "get 20%" of the profits. *See* Fowler Tr. Testimony 56:9-20.

On the same day that Jones met Z.S. and T.H.Y. through Fowler, Jones drove Z.S., T.H.Y.,

---

[3] Fowler and Jones had been friends for a few years, and he originally met her through someone affiliated with a gang. *See* Fowler Tr. Testimony 45:24-46:1, 10-15.

Fowler, and Smith[4] from D.C. to Smith's residence in Maryland in her car, a Chrysler. *See* ECF 328 No. 31; Taylor Tr. Testimony 100:21-25. Z.S. testified that she remembered the car that Jones drove because the rear window was broken. *See* Z.S. Tr. Testimony 49:10-50:15. Smith testified that she remembered that Jones's car had a lot of clothes in the backseat where Z.S. and T.H.Y. were sitting. *See* Smith Tr. Testimony 13:15-16; 14:9-13.

After the group arrived at Smith's house that evening, Jones asked Smith for "outfits" for Z.S. and T.H.Y. *See* Smith Tr. Testimony 22:6-24. Smith gave Jones a leotard and a two-piece zebra outfit. *See* Smith Tr. Testimony 23: 2-6. Z.S. and T.H.Y. put on the outfits that night, and Jones and Smith showed them how to pose and took photographs of both minors in the lingerie. *See* ECF 328 No. 32; Smith Tr. Testimony 24:14; Fowler Tr. Testimony 59:9-17; Z.S. Tr. Testimony 51:12-23. Jones used her phone to take these photographs and posted the photos online as commercial sex advertisements. *See* Fowler Tr. Testimony 60:12-21. Later that evening, Smith heard Jones discuss "outcalls," which she understood to mean commercial sex through online advertisements. *See* Smith Tr. Testimony 26:12-22. Indeed, Jones knew that the photos would be used in online advertisements, offering up the girls for commercial sex work.   Further, Jones knew, understood, and intended that Z.S. and T.H.Y. would engage in commercial sex, and that Jones could potentially receive some benefit from those acts.

In fact, Jones's phone number was used in the commercial sex advertisements. *See* ECF 328 No. 107; Fowler Tr. Transcript 53:8-12. Jones's email address, "bossyhoncho," was also used for posting and managing some of the commercial sex advertisements featuring  Z.S. and T.H.Y. on megapersonals. *See* ECF 328 No. 56.

---

[4] Jones and Smith did not know each other before that day. *See* Smith Tr. Testimony 13:19-20.

Later that same night at Smith's house, Jones became upset because she had believed that they were going to host a party at Smith's house, but the house did not have any electricity. Z.S. and T.H.Y. did not end up having any commercial sex dates that evening at Smith's home.

The next day, Jones called Lewis and said she "had some females" who could work in commercial sex. *See* Taylor Tr. Transcript 94:14-23. Jones then connected in person with Taylor and Lewis. *See* Z.S. Tr. Testimony 57:1-4; 58:16-23. Jones went back to Smith's house in Maryland to pick up Z.S. and T.H.Y., and drove them from Smith's home in Maryland to another location in Maryland in her car. *See* ECF Nos. 10, 89, 208. Later that day, Taylor and Lewis told Z.S. and T.H.Y. that they were going to work in the commercial sex enterprise and had them sign Loyalty Contracts. *See* ECF Nos. 10, 89, 208. Then, Jones drove Z.S. and T.H.Y. from Maryland to Virginia to engage incommercial sex work. *See* ECF Nos. 10, 89, 208. However, Z.S. did not end up engaging in a commercial sex act, because the customer did not want to pay before the "date." *See* ECF Nos. 10, 89, 208. Jones became upset by this result, and wanted to fight the customer. *See* ECF Nos. 10, 89, 208.

Jones is also known to Z.S., T.H.Y. and the co-defendants as "Brittany," Britt," "B," "Bricks," and/or "Bossy." *See* Smith Tr. Testimony 14:21; Fowler Tr. Testimony 45:16-23; Z.S. Tr. Testimony 48:18-23.

III.    **THE PRESENTENCE REPORT AND ADVISORY GUIDELINES RANGE**

The Presentence Report accurately summarizes the offense conduct in this case. *See* ECF No. 343. With one exception, the PSR also accurately calculates the Defendant's estimated Sentencing Guidelines. *See* ECF No. 343. The PSR calculates Jones's range as 135 months to 168 months based on a total offense level of 32 and a Criminal History Category of II. *See* ECF No. 343. However, as argued in the Government's Objections to Jones's PSR, *see* ECF No. 349, the

Vulnerable Victim Enhancement should be added as a Victim Related Adjustment in Paragraphs 53 and 60 for Z.S. and T.H.Y. *See* USSG § 3A1.1(b)(1); *see also United States v. Salahmand*, 651 F.3d 21, 26 (D.C. Cir. 2011); *United States v. Smith*, 374 F.3d 1240, 1248 (D.C. Cir. 2004). Therefore, the Combined Offense Level and Total Offense Level should be a 34 rather than a 32. *See* ECF No. 349. Based on a Total Offense Level of 34, and a criminal history category of II, the guideline imprisonment range should be 168-210 months, rather than 135-168 months.

## IV.    SENTENCING RECOMMENDATION

The government respectfully asks this Court to sentence Jones to a term of imprisonment of 180 months, to be followed by ten years of supervised release. The following Section 3353(a) factors support the government's recommendation.

### A. Nature and Circumstance of the Offense

First, "the nature and circumstances of the offense" warrant the prison sentence the Government recommends. Jones's involvement in the commercial sex enterprise vis-à-vis Z.S. and T.H.Y. was serious: she was the connection between the minor victims and Fowler and then, the minor victims and Lewis and Taylor. Indeed, the serious offenses committed by Lewis and Taylor would simply not have happened without Jones's participation.

Jones provided transportation between D.C., Maryland, and Virginia for Z.S. and T.H.Y. to engage in commercial sex dates. Her phone number and her email address were used in the online commercial sex advertisements for Z.S. and T.H.Y. She took photos of Z.S. and T.H.Y., using her phone, and orchestrated which outfits the minor girls would wear and how they would pose for the photos used for those advertisements. A prison sentence of 180 months is necessary and appropriate in light of Jones's role in posting commercial sex advertisements for Z.S. and T.H.Y., transporting the minors around the D.C. area for commercial sex dates, and introducing

Z.S. and T.H.Y. to Lewis.

### B.  Defendant's Personal History and Characteristics

Jones's personal history and characteristics further justify the Government's recommended sentence. According to the PSR, *see* ECF No. 343, Jones was raised in a religious and family-focused home in the D.C. area by both of her parents. Despite facing some hardships in her later adolescent and young adult years, Jones was able to hold a few jobs and received continuous support from various family members and friends. Despite the supportive network and job opportunities, Jones decided to become involved in this criminal enterprise and attempted to profit from the commercial sex of two minor girls.

Jones's full criminal history is accurately outlined in the PSR. Most notably, in 2016, she was charged with Assault and Battery of a Law Enforcement Officer, Obstruction of Justice, and Disorderly Conduct in Norfolk, Virginia. She pled guilty to these charges and received a sentence of 90 days in jail. Rather than learning from her encounter with the criminal justice system, Jones did not use her previous conviction to rehabilitate herself, but instead exhibited a disregard for the law and vulnerable people she could target and exploit.

During trial, Fowler testified that he had been friends with Jones since 2017 or 2018 and that he believed Jones was involved in a "Blood gang." *See* Fowler T. Testimony 46:1-15. He also testified that he knew Jones to throw stripper parties where females would come to a party and strip for money. *See id.* 46:21-47:8. Fowler specifically decided to call Jones when he was with Z.S. and T.H.Y. because he knew she was throwing parties and believed she would be able to provide transportation for him and the minor girls for commercial sex purposes. *See id.* at 55:7-17. When Fowler told Jones he "had two people trying to make some money on one of her parties," she simply responded that she was "on her way." *See id* at 56:6-12. Fowler's testimony about

Jones's prior involvement in throwing parties and her response to his request to come pick up two minor girls shows that her actions in relation to Z.S. and T.H.Y were not a one-time mistake or simple lapse in judgment.

Indeed, during her post-arrest custodial interview on July 30, 2019, Jones admitted that she picked up the minor girls with Fowler and Smith and drove them to Smith's house. She also admitted that they "were supposed to be having a party" but "something happened with my venue, so I cancelled it." She also stated that she thought Z.S. and T.H.Y. "were dancers that were going to dance at my party." Despite these admissions in her post-arrest custodial interview, Jones failed to take responsibility for her actions or show any remorse for her behavior.

### C.  Need to Protect the Public

Jones is currently 33 years old and has been in continuous custody since October 2019. Her charges in this case are serious. A sentence of 180 months is necessary to protect the public from further crimes from the defendant. In addition, ten years of supervised release is appropriate to ensure that Jones complies with the conditions of her release after incarceration and does not become involved in any commercial sex enterprise, nor commit any additional criminal offenses, in the future.

### D.  Need for Adequate Deterrence to Criminal Conduct

A sentence of 180 months is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and to adequately deter similar conduct. *See* 18 U.S.C. § 3553(a)(2)(A) & B & (a)(6). Sex trafficking is a prevalent crime in part because it is so profitable. *See* John Cotton Richmond, *Human Trafficking: Understanding the Law and Deconstructing Myths*, 60 St. Louis U. L.J. 1, 28 (2015). Unlike drugs or other commodities, commercial sex can be sold again and again. *Id.* Because prostitution is illegal,

victims are reluctant to report to law enforcement, which makes detection less likely. *Id.* at 40. Many victims have substance abuse issues, criminal histories, or ties to the trafficker that make prosecution difficult. *Id.* at 35. Indeed, here, Z.S. and T.H.Y. both ran away from a residential treatment facility. When they met Lewis and Jones, they had no money, no phone, and essentially no possessions. They were far away from home without any family or friends. This illustrates why traffickers, including Lewis, often assume that if they are prosecuted, the victims will not show up or will not be credible.  As sex trafficking offers high profits and frequently offers little risk of prosecution, a sentence for obstructing a sex trafficking investigation is necessary to provide deterrence.  A sentence of 180 months would properly reflect the seriousness of the offense and provide just punishment and adequate deterrence.

## V.   RESTITUTION

Restitution in this case is mandatory by law. Congress has provided, in the case of any offense under Chapter 77 of Title 18, which includes sex trafficking in violation of § 1591, that the Court "*shall* order restitution." 18 U.S.C. § 1593 (emphasis added). The restitution order "shall direct the defendant to pay the victim...the full amount of the victim's losses." *Id*. at (b)(1). The statute defines losses as the sum of two distinct types of compensation – personal losses and the economic value of the victim's services. *See id*. at (b)(3). The former is given the same meaning as the phrase "the full amount of the victim's losses" as defined in 18 U.S.C. § 2259(b)(3). 18 U.S.C. § 1593(b)(3). Such losses include any "losses suffered by the victim as a proximate result of the offense." 18 U.S.C. § 2259(b)(3)(F). These losses may include any costs incurred by the victim for the following:

> (A) medical services relating to physical, psychiatric, or psychological care;
> (B) physical and occupational therapy or rehabilitation;
> (C) necessary transportation, temporary housing, and child care expenses;
> (D) lost income;

(E) attorneys' fees, as well as other costs incurred; and

(F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3)(A)-(F) (2012). Section 2259(b)(3) is "phrased in generous terms, in order to compensate the victims of sexual abuse for the care required to address the long term effects of their abuse." *United States v. Laney*, 189 F.3d 954, 966 (9th Cir. 1999). Because victims of human trafficking similarly suffer long-term effects associated with the abuse inflicted by their traffickers, Congress required the same restitution calculations mandated in cases involving the sexual exploitation of children to apply to victims of human trafficking. As noted in subsection (F), the costs incurred by the victim must be proximately caused by the defendant's conduct in committing the trafficking offense. *See* 18 U.S.C. § 2259(b)(3)(F). In other words, the defendant should not be required to pay restitution for harm he or she did not cause. This does not mean, however, that the defendant must be the sole cause of the harm. *See United States v. Monzel*, 641 F.3d 528, 538  (D.C. Cir. 2011). In addition, "costs incurred by the victim" are not limited to losses incurred during the offense conduct. Restitution also includes compensation for estimated costs of future medical and mental health needs as well. *See id.; United States v. Pearson*, 570 F.3d 480, 486 (2nd Cir. 2009).

The second category of victim loss – the economic value of the victim's services – is defined as "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act (29 U.S.C. 201 et seq.)." 18 U.S.C. § 1593(b)(3). This definition seeks to compensate the victim for the value of the services the defendant caused the victim to perform – *i.e.* the stolen wages and profits realized by the trafficker during the commission of the trafficking offense. *See* 18 U.S.C. § 1593(b)(3).

In calculating "the gross income or value to the defendant of the victim's services or labor,"

courts have used various methods, including relying on victims' accounts of the work they performed and prices charged for such work, as well as evidence gathered during the government's investigation regarding the work performed. In a sex trafficking case, the value of a victim's services to a defendant is generally calculated based on a defendant's gross income from commercial sex acts performed by the victim. For example, in *United States v. Lewis*, 791 F. Supp. 2d 81 (D.D.C. 2011), the court based its restitution figures on the length of time the victims performed sex work for the defendant, the average number of clients the defendant compelled the victims to service each night, and the average price charged per client. *Id*. at 92-94. The restitution figures were not exact accountings of the work performed and prices charged, but instead the court's best estimate based on the available evidence. *Id*.

Similarly, in *United States v. Webster*, 2011 WL 8478276 (9th Cir. Nov. 28, 2011), the Ninth Circuit affirmed a restitution calculation in a sex trafficking case where the district court used the following calculation: "the number of weeks trafficked times the average number of days worked per week times the average number of dates per day times $150—the minimum amount the victims charged for a date[.]" *Id*. at *3. The court noted that "[a]ny error in the district court's figure [was] more than offset by the conservative estimate of the fee per date used to determine restitution," given that some victims had testified that they regularly charged more than $150 per date. *Id*.

Notably, because the statute defines losses by the "gross income or value to the defendant," the amount of proceeds generated should not be offset by expenses incurred by the defendant or proceeds shared with the victim. *See* 18 U.S.C. § 1593(b)(3); *see also Lewis*, 791 F. Supp. 2d at 93 n. 14. Therefore, if a defendant pays for hotel rooms, food, clothing, hair styles, etc., these expenses are <u>not</u> deducted from the "unjust enrichment" calculation because the statute is clear

that this calculation calls for the "gross" income or value generated.

Restitution equivalent to the victims' earnings is appropriate notwithstanding the fact that the defendant's unjust enrichment was derived from illegal activity – in this case, prostitution. In *United States v. Mammedov*, 304 F. App'x 922 (2d Cir. 2008), the Second Circuit stated, "the express terms of 18 U.S.C. § 1593 require that the victims in this case, *i.e.*, persons who engaged in commercial sex acts within the meaning of 18 U.S.C. § 1591, receive restitution, notwithstanding that their earnings came from illegal conduct." *Id*. at 927. And in *United States v. Fu Sheng Kuo*, 620 F.3d 1158 (9th Cir. 2010), the Ninth Circuit explained that "the Trafficking Act mandates restitution that includes a defendant's ill-gotten gains." *Id*. at 1164. Finally, in *United States v. Cortes-Castro*, 511 F. App'x 942 (11th Cir. 2013), the court declared "preposterous" a defendant's argument that such a restitution award would unfairly reward the victim for her illegal activity, given that the victim was "forced to prostitute." *Id*. at 947. *See also United States v. Williams*, 319 F. Supp. 3d 812, 816 (E.D. Va. 2018) (finding that "it is appropriate, and indeed necessary, to consider the gross income or value of the minor victims' prostitution activities in calculating the amount of restitution owed by defendants here").

The government bears the burden of proving the proper amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e). However, "courts have made clear that the amount of restitution need not 'be proven with exactitude.'" *Williams*, 319 F. Supp. 3d at 816 (quoting *In re Sealed Case*, 702 F.3d 59, 66 (D.C. Cir. 2012)). The government may rely on summary reports, law enforcement testimony, and other evidence that would be admissible at trial to support a restitution calculation.

Notably, the text of the TVPA makes clear that restitution orders under the TVPA "shall be issued and enforced in accordance with section 3664 in the same manner as an order under

3663A." 18 U.S.C. § 1593(b)(2). Section 3664(h), in turn, provides that if more than one defendant has contributed to a victim's loss, "the court may make each defendant liable for payment of the full amount of restitution[.]"

In this case, testimony of Z.S. and other individuals, CashApp records, hotel records, and text messages establish that Z.S. and T.H.Y. engaged in commercial sex at Lewis's direction and gave him the monetary proceeds of their commercial sex activities. Z.S. worked for Lewis for approximately fourteen days: from April 28, 2019 to May 10, 2019. *See* ECF 328 No. 27, Z.S. Tr. Testimony 46:3-7, 47:18-19, 55:13-15, 85:2-13, 86:8-17. T.H.Y. worked for Lewis for approximately six days, from April 28, 2019 to May 3, 2019. *See id.* Z.S. and T.H.Y. were with Jones for one to two days, and did not have any commercial sex dates for Jones's profit. Along these lines, Z.S. testified that she and T.H.Y. didn't make any money with Fowler or Smith, *see* Z.S. Tr. Testimony 46:3-7, 47:18-19, 55:13-15, but did start doing dates when she and T.H.Y. met Lewis and Taylor through Jones. *See id.* at 68:11-22. She also testified that dates would typically pay her and T.H.Y. $140 or $150, and the arrangement was for them to keep 30% of the payment. *See id.* at 68:23-70:6, 89:7-9. However, even though Z.S. and T.H.Y. were supposed to get 30% of the profit, there were times that they didn't get to keep this amount and would give all or "a lot" of the money to Taylor, who then gave it to Lewis. *See id.* at 75:2-8, 76:12-24; 54:22-55:3. Z.S. also testified that she and T.H.Y. did ten to fifteen dates every day when they were with Lewis and Taylor, and did not have any days off. *See id.* at 88:17-22; 89:5-6. Lewis and Taylor took all of Z.S.'s money when she left. *See id.* at 18:5-17. Lewis and Taylor also took all of T.H.Y.'s money when she left. *See id.* at 15:24-16:5; 39:11-14.

Based on this testimony and evidence, a conservative calculation of the amount that Z.S. made in the commercial sex enterprise is $13,720.00 (14 days, 10 dates per day, $140 per date,

keeping 30% of the money). On the other end, the largest estimate that Z.S. made in the commercial sex enterprise is $31,500 (14 days, 15 dates per day, $150 per date, giving all the money to Lewis and Taylor). An average calculation between these two figures is $22,610 as to Z.S.

A conservative calculation for T.H.Y. is $5,800 (6 days, 10 dates per day, $140 per date, keeping 30% of the money). The high estimate for T.H.Y. is $13,500 (6 days, 15 dates per day, $150 per date, giving all the money to Lewis and Taylor). An average calculation between these two figures is $9,690 as to T.H.Y.

The government accordingly moves the Court to order Jones to pay restitution to Z.S. in the amount of up to $22,610 and to T.H.Y. in the amount of up to $9,690. As of the time of this submission, the government is still working with counsel for Z.S. and T.H.Y. to determine any additional costs associated with the losses these minor victims incurred as a result of the commercial sexual exploitation they endured.  Such amounts would be based on existing and future health care needs, mental health costs, and other costs incurred as a result of the losses they suffered as being recruited into the commercial sex enterprise. The government will provide this information to the Court and defense once it is finalized.

Jones was convicted of sex trafficking of minors and related transportation charges, and the evidence adduced at trial showed that Jones contributed to the victims' losses by transporting the victims to commercial sex dates, taking photos of the victims for commercial sex ads, using her phone and email addresses to post commercial sex advertisements, and introducing the victims to Lewis and Taylor. Because she contributed to the minor victims' losses, the statute plainly enables the court to make each defendant jointly and severally liable for the full restitution amount. However, Jones's level of culpability as compared to Lewis is arguably lower. Therefore, the

government submits that it would be appropriate to order Jones to pay a lesser amount of restitution to the minor victims.

Therefore, the government submits that it would be appropriate to order Jones to pay a smaller amount of restitution to the minor victims as compared to what the government intends to request from Lewis. Specifically, the government suggests that the Court order Jones to pay restitution in the amount of $10,000 to each Z.S. and T.H.Y.

VI.     **REQUIREMENT TO REGISTER AS A SEX OFFENDER**

This conviction Jones has sustained in this case gives rise to the requirement that she register as a sex offender. *See* 42 U.S.C. §§ 16911, 16913, 16915. The government asks the Court to instruct the defendant of her obligations in this regard.

VII.    **FORFEITURE**

The government will provide to the Court a motion and proposed order of forfeiture before sentencing. The government asks the Court to sign an Order of Forfeiture that will require the defendant to forfeit all property that was intended to be used or was used in the commission of the offenses.

VIII.   **CONCLUSION**

For the foregoing reasons, the government respectfully requests the Court to impose a sentence of 180 months, to be followed by ten years of supervised release, and order Jones to pay restitution in the amount of $10,000 to each Z.S. and T.H.Y.

DATED this 28th day of September, 2022.


MATTHEW GRAVES
United States Attorney


By:     /s/     Elizabeth Hutson

Janani Iyengar
Assistant United States Attorney
NY State Bar No. 5225990
U.S. Attorney's Office
600 D Street, N.W.
Washington, D.C. 20530
202-252-7760
Janani.iyengar@usdoj.gov

Elizabeth A. Hutson
Trial Attorney
D.C. Bar No. 1034845
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-532-5578
Elizabeth.Hutson@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I certify that on September 28, 2022, I caused the foregoing to be filed with the court using the CM/ECF system that will send notification of such filing to all registered users.


*/s/*_____
Elizabeth Hutson